**MARTIN MARIETTA CORPORATION,
a Corporation of the State of
Maryland, Appellant,**

v.

**NEW JERSEY NATIONAL BANK, a National Banking Association, Defendant
and Plaintiff on Counterclaim,**

v.

**TAMBURELLI PROPERTIES, INC., Additional Defendant on Counterclaim.**

No. 79–1447.

United States Court of Appeals,
Third Circuit.

Argued Nov. 13, 1979.

Decided Dec. 28, 1979.

Jerome J. Graham, Jr., Laurence Reich, William A. Carpenter, Jr., Carpenter, Bennett & Morrissey, Newark, N.J., for appellant.

Richard N. Shaine, Stark & Stark, Lewis J. Pepperman, Trenton, N.J., for appellee.

Before SEITZ, Chief Judge, ALDISERT, Circuit Judge, and HUYETT, District Judge.[*]

## OPINION OF THE COURT

SEITZ, Chief Judge.

This is a diversity case involving New Jersey law in which the plaintiff, Martin Marietta Corp., appeals from a final judgment for the defendant, New Jersey National Bank. After trial without a jury, the district court held that the defendant's se-

curity interest in certain sand held as inventory takes precedence over the rights of the plaintiff because the plaintiff does not qualify as a buyer in ordinary course under the Uniform Commercial Code (UCC).[1]

### I. *Factual Background*

Hollander Sand Associates (Hollander)[2] is involved in the excavation and sale of sand for commercial and construction use. In the fall of 1972 and the spring of 1973, Hollander obtained a series of loans from the defendant. In the spring, the defendant and Hollander executed a security agreement and financing statement, and the defendant made the filings required by the UCC to perfect its security interest.

Both the security agreement and the financing statement provide in relevant part that collateral for the loan shall be:

> All of Debtor's . . . inventory . . . and any and all sand . . . now or hereafter located and extracted [at Hollander's New Jersey plant] . . . and any and all other assets of whatsoever kind, nature and description of Debtor, whether now existing or hereafter acquired, including by way of example, but not by way of limitation, any and all additions, accessions, replacements and substitutions to or for the same, together with the proceeds and products thereof.

In addition, item 7 on the financing statement was checked to indicate that the proceeds from sales of the collateral would be covered by the security agreement.

Part of the plaintiff's operations include production of road construction materials. Prior to the events involved here, it did not have its own source of natural sand for concrete. In the late summer of 1973, facing cash flow problems, Hollander contacted the plaintiff and several other firms

---

* Honorable Daniel H. Huyett, 3rd, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. New Jersey has enacted the UCC, see N.J. Stat.Ann. tit. 12A, and we will cite to the uniform citation form for the remainder of this opinion.

2. Hollander Properties, Inc., leased the property on which the sand was extracted and stored to Hollander Sand Associates. Both entities conveyed all their interest to Hollander Sand, Inc., in 1974. Because these events have no relationship to the issues presented, for simplicity we will refer to the three collectively as "Hollander."

with respect to a possible acquisition of Hollander by one of the firms. In August of 1973, the plaintiff's representatives began meeting with Hollander to discuss the purchase.

On August 22, 1973, John P. Frawley, part of the managerial staff in the plaintiff's acquisition department, wrote to his superior:

> As an alternative to a quick purchase [of Hollander], which we are not recommending because of the [railroad] situation, I suggest we explore with Hollander Sand the possibility of negotiating the purchase of all their sand production contingent upon [railroad] rates and as part of the sole right to retail, we include the first right of refusal to purchase their operation.

Pursuant to this plan the plaintiff made an oral agreement in September of 1973 with Hollander to buy 50,000 tons of sand per month in October, November, and December of 1973. Apparently the three-month period was decided upon because Frawley had stated it would take three months to decide whether or not to purchase Hollander.

From the beginning of October 1973 until January 1974, the plaintiff bought approximately 136,000 tons of sand. During the October to January period, it sold about 55,000 tons to its customers and transferred 4,000 tons to some of its facilities. The remaining tons were left at Hollander's plant in New Jersey. By January 1974, the plaintiff had paid for all the sand.

Sometime in late December of 1973 or early January 1974, the plaintiff decided not to purchase Hollander. The question remaining was what to do with the sand at Hollander's plant. On January 14, 1974, three of the plaintiff's representatives went to Hollander's plant. After some conversation with Hollander representatives, the plaintiff's representatives placed signs on some of the piles of sand reading: "Property of Martin Marietta Aggregates."

Between January 1 and April 30, 1974, the plaintiff sold about 9,500 tons of the sand to customers and took possession of 930 tons. In August and September of 1974, Hollander bought back 4,000 tons for cash. In October of 1974, the plaintiff surveyed Hollander's stockpiles and ascertained its inventory to be approximately 62,500 tons.

In the fall of 1974, Hollander began having trouble meeting its loan payments to the defendant. It finally defaulted, and the defendant took over the plant on December 7, 1974, giving its agent authority to sell the sand present there.

■ The plaintiff then began this action for conversion against the defendant. The district court held that the defendant's security interest in Hollander's inventory of sand took precedence over any rights of the plaintiff for two reasons. First, the district court held that the sand in the possession of Hollander had not been properly identified as required by the UCC so as to give the plaintiff a legally cognizable interest in it against the defendant. Second, it held that the plaintiff's purchase of the sand for the predominant purpose of keeping Hollander viable pending the plaintiff's decision whether to buy it was bad faith precluding the plaintiff's recovery as a buyer in the ordinary course under article 9 of the UCC.

Before we turn to each of these issues, we first consider the plaintiff's argument in this court that the district court was clearly erroneous in its finding as to the plaintiff's predominant intent because by January the plaintiff had decided not to buy Hollander. We are not persuaded by this argument. In August and September, the period around the time when the contract was made, the plaintiff was considering a purchase of Hollander. During that time, one of the plaintiff's employees suggested the purchase of the sand as an alternative to an immediate purchase of Hollander. Moreover, the plaintiff entered into a contract obligating it to purchase a large amount of sand over a three-month period, exactly the

amount of time its employee said it would take to make a decision. Thus we do not think the district court's finding of fact on this point was clearly erroneous.

## II. Identification

■ Where goods remain in the possession of the seller, the buyer cannot assert claims against third parties unless the goods are identified. *See* UCC §§ 2–722; 2–501(1). Assuming without deciding this rule would apply to a buyer's claim vis-a-vis an article 9 secured creditor, a question not directly addressed in the Code or New Jersey case law, *cf.* New Jersey Study Committee Comment to N.J.Stat.Ann. § 12A:2–501, comment 2, identification can occur in one of two ways as to the type of goods here: either by express agreement of the parties or, in the absence of such an agreement, by operation of rules set out in the Code. *See id.* § 2–501.

The district court did not address the possibility of an express agreement, basing its holding instead on the rules that determine identification absent an express agreement. Application of these rules depends on whether the goods were existing on the date the contract was formed in September of 1973. If the goods existed in September, then identification occurred when they were "existing and identified." UCC § 2–501(1)(a). If they came into existence after September, they became identified when the seller "designated" them as the property of the buyer. *Id.* § 2–501(1)(b). Noting that the record was ambiguous regarding when the goods came into existence, the district court held that it made no difference because neither of the two rules was satisfied.

■ We need not determine whether the January placement of the signs was an express agreement within § 2–501(1) as the plaintiff argues because we find that the district court improperly applied the legal rules that operate absent an express agreement. At the outset, it is important to note the limited purpose that the identification requirement serves. The purpose of § 2–501 is to determine the point in time when

the buyer has an insurable interest in the goods or a special property interest that has relevance in a variety of contexts, such as when the goods are lost or the seller becomes insolvent prior to delivery. *See, e. g.,* UCC §§ 2–502, 2–510, 2–613; *id.* § 2–501, comment 1. In light of this narrow objective, "the general policy is to resolve all doubts in favor of identification." *Id.* § 2–501, comment 2.

■ Turning to the facts here, we will assume, as did the district court, that the record is ambiguous on the question of when the sand came into existence. We therefore first consider the rule that operates if the sand existed in September. The question is how much must take place for the goods to be "existing and identified" within the meaning of § 2–501(1)(a). The district court reasoned that the January placement of the signs would be inadequate because § 2–501(1)(a) requires that the identification had to have occurred contemporaneously with the formation of the contract in September.

The comment to this provision indicates: "Undivided shares in an identified fungible bulk . . . can be sold. The mere making of a contract with reference to an undivided share in an identified fungible bulk is enough [to satisfy the rule in § 2–501(1)(a)]." UCC § 2–501, comment 5. The rule stated in this passage is in accord with the general policy already noted. Although the precise terms of the oral contract are not clear on this record, it seems undisputed that Hollander and the plaintiff referred to a specific amount and mentioned the sand at Hollander's New Jersey plant. We therefore hold that if the sand existed in September, it was identified when the plaintiff and Hollander referred to it in their oral contract.

Next, we consider the district court's holding that the sand, if it existed after September, was not "designated by the seller as goods to which the contract refers" and therefore was not identified under § 2–501(1)(b). None of the factors noted by

the district court are sufficient to overcome the policy favoring identification. First, the district court held that § 2–501(1)(b) requires designation by the seller, and the plaintiff, not Hollander, had placed the signs in January 1974. The mere fact that the plaintiff, not Hollander, physically placed the signs does not mean that Hollander did not "designate" the sand as the plaintiff's. The legend on the signs is a clear assertion of ownership by the plaintiff. That Hollander made no objection to their placement at the time seems undisputed. Nowhere in its brief or at oral argument did the defendant point to any evidence in the record that Hollander objected to the placement of the signs at the time it occurred. Thus at least as far as the record indicates, there was acquiescence by silence in the plaintiff's actions.

In addition, Hollander's statements to the plaintiff after the incident contain nothing to indicate that Hollander felt the sand was not identified. For example, on June 22, 1974, Hollander wrote to the plaintiff: "Per your request this letter serves to confirm your inventory of sand with Hollander Sand Associates in the amount of 66,443 tons." An interoffice memorandum of Hollander written to confirm the October 1974 meeting with the plaintiff states: "The limits of the pile of sand owned by [Martin Marietta] were outlined by Worthington. Measurements of the pile were made by Worthington and Dobelbower. Vertical cutoff points at the edge of the road on the east side, the south limits, and between [Martin Marietta's] sand pile and recently processed sand on the west side are shown on the X-sections as directed."

This conduct shows the following: Hollander did not object when the plaintiff placed signs clearly indicating ownership, Hollander never indicated a contrary intent to the plaintiff, and in October Hollander's internal memorandum referred to a specific pile as the plaintiff's pile. When a seller acquiesces by silence in the face of the buyer's clear assertion of ownership and then its subsequent course of conduct never indicates to the buyer that it feels the assertion of ownership was invalid, that seller

should not be able to say the goods were not designated merely because it did not personally place the signs. To elevate the phrase "designated by the seller" into an absolute requirement of positive physical activity by the seller is to return to the formalism that the Code tries to escape. *See, e. g.,* UCC § 1–102, comment 1.

The defendant further argues that the sand was not identified by designation because Hollander treated the sand inconsistently with such a designation by selling it to other customers. The district court relied in part on this argument when it noted that the sand was near the loading platform and that Hollander sold the sand to others.

We feel this argument does not overcome the facts in this case. As already noted: "Undivided shares in an identified fungible bulk . . . can be sold. The mere making of a contract with reference to an undivided share in an identified bulk is enough." UCC § 2–501, comment 5. Although this passage deals with goods that exist when the contract is made, it demonstrates that treating fungibles as did Hollander here is consistent with an intent on the part of Hollander to identify or designate the goods. The crux of the passage is that if the seller removes some of the fungibles and later replaces them, that should not undercut the policy favoring identification, probably because such conduct is quite natural with fungibles and cannot be taken as an intent to negate the buyer's interest in the goods. In short, sale and replacement of the sand here does not overcome either the facts or the policy favoring identification. *See generally* New Jersey Study Committee Comment to N.J.Stat.Ann. § 12A:2–501, comment 4.

Finally, the district court relied on the fact that the piles of sand in question contained sand of a type not covered by the Hollander-plaintiff contract. This does nothing to detract from the fact that the seller acquiesced in the buyer's assertion of ownership over the sand that was covered by the contract. Indeed, there is nothing in

the Code or the comments that suggests that designation cannot relate to only a portion of certain goods.

Given Hollander's acquiescence in the plaintiff's placement of the signs with a clear intent to exercise ownership, Hollander's subsequent conduct, the nature of fungible goods stored in bulk, and the policy favoring a finding of identification, we hold that the sand was identified as the property of the plaintiff by designation within the meaning of § 2–501(1)(b). Because both subsections (a) and (b) of § 2–501(1) are satisfied, the goods were identified regardless of when they came into existence.

### III. *Buyer In Ordinary Course*

Under § 9–307(1), a buyer in ordinary course takes free of any secured interest of a creditor. Section 9–307(1) contains a cross-reference to § 1–201(9), which defines "buyer in ordinary course" as follows:

> "Buyer in ordinary course of business" means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind  .  .  . .

UCC § 1–201(9). This case presents us with the interpretation of two phrases in this definition: "good faith" and "buys in ordinary course."

At the outset, we note that these two phrases overlap to some extent. For example, if the sale was a sham to avoid the seller's obligation to his creditor, then it probably would not satisfy either of these two elements of the buyer in ordinary course requirement. Nevertheless, we feel that the two concepts must be kept analytically distinct, and we now consider each in turn.

### A. *Good Faith*

There is a split among states as to whether good faith as it applies to a buyer in ordinary course under § 9–307(1) is to be tested by a subjective or objective standard. Those courts picking a subjective standard have relied on § 1–201(19), which defines

good faith as "honesty in fact." Those courts picking an objective standard have relied on § 2–103(1)(b), which states: " 'Good faith' in the case of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *See generally Sherrock v. Commercial Credit Corp.*, Del., 290 A.2d 648 (1972). *See also Tumber v. Automation Design & Mfg. Corp.*, 130 N.J.Super. 5, 324 A.2d 602 (L.Div. 1974) (discussing good faith of buyer in ordinary course under § 2–403, which deals with entrusting goods to merchant).

Although the parties have cited no New Jersey case directly addressing the question of what good faith means in the context of § 9–307(1) and we have found none, we feel the standard for good faith under § 9–307(1) is a subjective one. Section 9–307(1) cross-references to § 1–201(9), which includes good faith as part of the definition of buyer in ordinary course. The definition in § 1–201(9) also refers to knowledge of the violation of a security agreement, which is some evidence that the drafters contemplated a subjective standard for § 9–307. Moreover, § 9–307(1) itself says that the buyer takes free of the security interest "even if [he] knows of its existence," which buttresses this conclusion.

In addition, the definitions in § 1–201 apply throughout the code "[s]ubject to additional definitions contained in the subsequent Articles" or "unless the context otherwise requires." The very absence in article 9 of an additional definition, in contrast to article 2, is indicative of an intent that the article 1 definition control. As to the context, the cross-reference in § 9–307(1) to the article 1 definition of buyer in ordinary course seems to contemplate general use of the article 1 definitions. In short, we feel it inappropriate to import the article 2 definition into article 9 without more explicit statutory authority.

The district court here held that the plaintiff's conduct did not satisfy a subjective standard of good faith. The court noted the following factors as determinative: the amount purchased was far greater than

any single purchase the plaintiff had ever made, the plaintiff's acquisition department never consulted its sales people about resale possibilities, the sale was made at a time when the demand for sand was low (making resale less likely), and the plaintiff tried to terminate the contract after it decided not to buy Hollander. The court found that all this amounted to a predominant purpose of keeping Hollander viable pending the purchase decision, making the plaintiff in subjective bad faith.

It is important to note how the general definition of good faith operates in the context of article 9. Section 9–307(1) itself states that the buyer in ordinary course takes free of a security interest even if he knows of its existence. Section 1–201(9) says the buyer must be "without knowledge that the sale to him is in violation of . . . the security interest of a third party." The comment explains how these two sections relate in the context of the good faith requirement: "the buyer takes free if he merely knows there is a security interest which covers the goods but takes subject if he knows, in addition, that the sale is in violation of some term in the security agreement not waived by the words or conduct of the secured party." UCC § 9–307, comment 2.[3]

In addition, the use of the work "know" in both § 1–201(9) and § 9–307(1) is significant. The Code carefully distinguishes notice and knowledge, defining the latter as knowledge in fact and not constructive notice. *See* UCC § 1–201(25); *Federal Insurance Co. v. Pipeco Steel Corp.*, 125 N.J.Super. 563, 312 A.2d 510 (App.Div. 1973). Even assuming constructive notice of the existence of a security interest because of the filing of the financing statement, *see* note 3 *supra*, the Code seems to contemplate that only actual knowledge as to whether the sale violates the security agreement constitutes bad faith.

Thus the crux of the good faith inquiry under § 9–307(1) is the buyer's state of mind with respect to the security agreement between his seller and the seller's creditor. Here, the intent found by the district court tells us nothing about the plaintiff's state of mind as to whether the sale violated the Hollander-defendant security agreement. All that the evidence shows, and all that the district court found, was that the plaintiff wanted to keep Hollander viable pending a purchase decision. We have not been pointed to any evidence whatsoever that the plaintiff in fact knew the terms of the security agreement or anything else that would tend to show knowledge that the sale violated the security agreement.

It is true that if a buyer wants to keep a seller viable, it may be inferred that the buyer probably knows that the seller is having trouble with creditors. Yet that only shows that the buyer knows that creditors exist; it says nothing about whether the buyer knows the creditors are secured or unsecured or whether the buyer knows the sale violates any security agreement. In short, mere intent to keep Hollander viable pending a purchase decision, without more, does not satisfy the standard relating to good faith in article 1 as it applies to article 9.

Moreover, even assuming that the plaintiff knew of the terms of the security agreement, there is only one provision in it that seems relevant here. The security agreement states: "As to Collateral which is inventory, sand, gravel or other minerals heretofore or hereafter extracted from the Sand Plant, [Hollander] may, until notice from the Bank, sell, lease or otherwise dispose of it in the ordinary course of business and collect the cash or non-cash proceeds thereof."

Thus assuming that the plaintiff knew of this provision, the relevant question is

---

**3.** This statement makes even more sense when viewed in light of what the Code requires as to filing. All a creditor need file is a financing statement, which usually is a standard form that merely says the security agreement exists and lists the collateral. *See* UCC §§ 9–402 to –403. By contrast, the security agreement, which usually is not filed, reveals the rights and obligations between the debtor and the creditor.

whether the plaintiff knew the sale was one not in ordinary course. This depends on whether in fact the sale was not in ordinary course, a question to which we turn in the next section. Although good faith and buying in ordinary course are analytically distinct, in this case the answer to one is determined in part by the answer to the other. Because the district court did not consider the question in this manner, we reverse and remand.

### B. *Buying in Ordinary Course*

In part, § 1–201(9) defines a buyer in ordinary course as one who "[1] buys in ordinary course . . . [2] from a person in the business of selling goods of that kind." The second clause clearly requires an inquiry into the seller's status. The question here is whether the first clause requires an inquiry into the nature of the transaction or the buyer's status. The defendant argues that the plaintiff's intent to keep Hollander viable and the characteristics of the transaction transform the plaintiff into a financier or creditor of Hollander and thus not a buyer in ordinary course.

As an initial matter, it is unfortunate that the Code defines "buyer in ordinary course" in part by using the exact words to be defined. By saying that a buyer in ordinary course is one who buys in ordinary course, the phrase seems redundant and thus meaningless. Instead of asking whether a buyer in ordinary course must buy in ordinary course, it seems to clarify the issue to ask whether a buyer under § 1–201(9) must buy in ordinary course.

No New Jersey case directly addresses the meaning of the phrase "buys in ordinary course." *Cunningham v. Camelot Motors, Inc.*, 138 N.J.Super. 489, 351 A.2d 402 (Ch.Div. 1975), listed a four part test for determining whether a buyer satisfies the test of § 1–201(9): good faith, no knowledge a security interest is violated, seller in the business of selling this type of goods, and payment in present value. Although the court did not say whether the buyer also must buy in ordinary course and held that all four elements were satisfied, it seems that the precise question of whether

the phrase "buys in ordinary course" has independent meaning was not presented directly. This is so probably because the buyer was a consumer who bought a car, the prototypical buyer in ordinary course. Thus we have little case law guidance as to how New Jersey would treat the present issue.

We feel that the phrase "buys in ordinary course" requires some inquiry into the nature of the transaction. The words cannot refer to the seller's status, for they then would be redundant of the phrase "in the business of selling goods of that kind." We invoke the doctrine of construction that every phrase in a statute should be given meaning if possible. We believe that New Jersey courts faced with this question would not read out these words in § 1–201(9).

It remains to be answered exactly what meaning should be given the phrase "buys in ordinary course." Some of the normal situations where courts have found that a party did not buy in ordinary course do not seem to be present here. *See, e. g., Morey Machinery Co. v. Great Western Industrial Machinery Co.*, 507 F.2d 987 (5th Cir. 1975) (close relation of the buyer and seller raising a danger that the sale was effected to protect the collateral from the seller's creditor); *Ray v. City Bank & Trust Co.*, 358 F.Supp. 630 (S.D.Ohio 1973) (sale was partial satisfaction of prior debt owed by seller to buyer). *See generally Independent News Co. v. Williams*, 293 F.2d 510 (3d Cir. 1961).

The facts noted by the district court as detailed in the previous section do pose one problem, however. It found that the plaintiff purchased an unusual amount for the plaintiff at a time of slow market demand. Given Hollander's financial position, there thus was a danger that it would dissipate the large influx of cash, either by using it to pay unsecured creditors or by other means, leaving the defendant without collateral to secure its loan.

This presents a very close question. The activities falling inside or outside the ordinary course test lie along a spectrum. At

one end, the grocery retailer who buys a single shipment of canned goods buys in ordinary course. At the other end, the person who buys the business with all its inventory does not buy the inventory in ordinary course. What we have here is a situation somewhere between the two. While it might be possible to come up with a judicially formed test that addresses the question, we think that article 6 of the UCC provides a possible framework for analysis.

Under article 6, a bulk sale of inventory of a debtor triggers certain rights in the creditor such as notice from the buyer and a chance to step in and protect its interest. *See* UCC §§ 6–104 to –105. One of the problems sought to be corrected was dissipation of the proceeds of the sale by the debtor to the detriment of the creditor. *Id.* § 6–101, comments 2, 4. Although the comment only mentions the debtor who runs away with the proceeds, we feel that the present situation is sufficiently analogous to warrant use of article 6. Where the Code addresses itself to the same type of problem as that here, we think it better to rely on those provisions rather than trying to formulate a rule ourselves. Moreover, this reasoning is consistent with the goal of the UCC, which is to read the Code as an integrated whole and a comprehensive attempt to deal with problems from a variety of perspectives.

■ The facts here require a remand for the district court to consider the question in the first instance. For example, the district court must first decide if this was a bulk sale under article 6. *See* UCC § 6–102(1) (sale of a "major part" of the inventory); New Jersey Study Committee Comment to N.J.Stat.Ann. § 12A:6–102, comment 2. This in part will involve the question of what time frame to use in deciding what proportion of Hollander's inventory was sold (*e. g.*, monthly or yearly inventory). Next, the district court must determine if the plaintiff and Hollander complied with article 6. Finally, the court should consider whether the buyer can prevail on any other ground against the creditor under article 6 and whether that ground applies to article 9.

In short, we believe that a bulk sale within article 6 would not be a purchase in ordinary course under § 1–201(9) and § 9–307(1). Accordingly, we reverse and remand to the district court for further proceedings on this question and any other theory that may be applicable.

## IV.

The judgment will be reversed and the case remanded for further proceedings consistent with this opinion.