**MARTIN MARIETTA CORPORATION, a Corporation of the State of Maryland, Plaintiff,**

v.

**NEW JERSEY NATIONAL BANK, a National Banking Association, Defendant,**

**and**

**Tamburelli Properties, Inc., a Corporation of the State of New Jersey, Defendant.**

**Civ. No. 75-644.**

United States District Court, D. New Jersey.

Jan. 15, 1981.

---

Carpenter, Bennett & Morrissey, by Jerome J. Graham, Newark, N.J., for plaintiff.

Stark & Stark, by Lewis J. Pepperman, Trenton, N.J., for defendant Bank.

## OPINION

HAROLD A. ACKERMAN, District Judge.

## I BACKGROUND

This diversity case involves a dispute over 62,443 tons of sand. The plaintiff, Martin Marietta Corporation, purchased about 136,657 tons of sand during the last three months of 1973 from Hollander Sand Associates, ("Hollander")[1] taking delivery on 59,189 tons and stockpiling the rest at Hollander's facilities in Woodmansie, New Jersey.[2] The stockpiled sand, as inventory of Hollander, was subject to a security interest held by the defendant New Jersey National Bank ("Bank"). Throughout the fall of 1974, Hollander had trouble meeting its loan payments to the Bank and finally defaulted. On December 7, 1974, the Bank took over the sand plant and authorized its agent to sell the sand located there. The plaintiff, claiming that the Bank sold its sand, brought suit for conversion.

This case is before the District Court for the second time after a remand from the Third Circuit. Initially, after a non-jury trial before my predecessor the Honorable George H. Barlow, the district court found

---

1. Hollander Sand Associates operated its sand plant on property leased from Hollander Properties, Inc. In 1974, both entities conveyed all their interest to Hollander Sand, Inc. Because these events are irrelevant to the issues presented, I will follow the example of the Court of Appeals in *Martin Marietta Corp. v. New Jersey National Bank*, 612 F.2d 745, 747 n.2 (3d Cir. 1979) and refer to the entities collectively as "Hollander".

2. In early 1974 Martin Marietta shipped an additional 9,456 tons of sand to customers and transferred 930 tons to its own facilities in Tarrytown, New York. In September 1974 Martin Marietta sold back to Hollander 4,000 tons from the stockpile. Another 649 tons is categorized as a quantity discrepancy.

for the defendant Bank on two grounds. First, it held that the sand had not been identified to the contract, a necessary prerequisite under the Uniform Commercial Code to asserting claims against third parties, in this case the Bank, when the goods in question have remained in the possession of the seller. N.J.S.A. 12A:2–722. Second, the district court held that Martin Marietta did not meet the good faith requirement of a "buyer in the ordinary course of business" and therefore could not take priority over the Bank's perfected security interest as provided in N.J.S.A. 12A:9–307.

The Third Circuit reversed on both grounds. It held that the sand had been identified to the contract between Martin Marietta and Hollander, although the record was unclear as to when exactly this identification occurred. *Martin Marietta Corp. v. N.J. National Bank*, 612 F.2d 745, 751 (3d Cir. 1979). Thus, Martin Marietta was entitled to assert a claim against the Bank, a third party, even though the sand had been left in the possession of the seller, Hollander.

Under N.J.S.A. 12A:9–307, a "buyer in the ordinary course of business" takes free of a perfected security interest created by his seller even if the buyer knows of the security interest. "Buyer in the ordinary course of business" is defined in N.J.S.A. 12A:1–201(9) as:

.... a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.

.    .    .    .    .

The Third Circuit considered two elements, "good faith" and "buying in the ordinary course," to be critical in determining whether Martin Marietta satisfied this definition. Adopting a subjective standard, the court stated that in this case, the question of good faith turned upon whether the plaintiff knew that the sale of sand was not in the ordinary course. *Martin Marietta, supra* at 753. But this question, in turn, depends on whether in fact the sale was not in the ordinary course. The court, however, declined to establish a test for determining "buying in the ordinary course." Stating that the article on bulk transfers, N.J.S.A. 12A:6–101 *et seq.* provided a possible framework for analysis of this question, the Third Circuit remanded the case for consideration on that theory and any other theory that may be applicable. *Martin Marietta, supra* at 754. The parties have agreed to a trial on the record as established. This opinion constitutes my findings of fact and conclusions of law on remand.

For the reasons which I will explain in greater detail herein, I have concluded that the transaction between Martin Marietta and Hollander did not constitute a bulk transfer because it was in the ordinary course of business of Hollander. Martin Marietta's rights in the sand, therefore, take precedence over New Jersey National Bank's security interest. Additionally, I have considered the Bank's newly raised defenses under N.J.S.A. 12A:2–402(2) (fraudulent retention) and N.J.S.A. 12A:2–712 (cover) because the Third Circuit's directions on remand invited consideration of other applicable theories for resolution of the dispute. However, in my judgment the facts do not support the defenses raised and the defendant Bank is liable to Martin Marietta for conversion of the sand.

## II  BULK TRANSFER

A bulk transfer is defined in N.J.S.A. 12A:6–102(1) as:

. . . any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or other inventory of an enterprise subject to this Article.

Enterprises subject to article 6 are "all those whose principal business is the sale of merchandise from stock, including those who manufacture what they sell." N.J.S.A. 12A:6–102(3). Since Hollander was in the business of selling sand either from stockpiles or as it was dredged, it appears to be an enterprise subject to article 6. I note,

however, that one commentator has suggested that businesses, in which bulk transfers are a common and accepted part, are not subject to article 6. Raff, *Bulk Transfers under the Uniform Commercial Code*, 17 Rutgers L.Rev. 107, 108 (1962).

In assessing whether the transaction between Martin Marietta and Hollander meets the definition of a bulk transfer, I must first determine what the ordinary course of business was for Hollander. This inquiry is hampered by the fact that Hollander began production in June 1973, only a few months prior to the transaction in question. There is thus no established pattern of business behavior with which to compare the Martin Marietta purchase. It is appropriate, therefore, to consider the projected course of business based on production capacity.

The facts reveal that the sand plant was situated on 1,500 acres with a potential yield of 50 million tons of natural sand. The plant had the capacity to process approximately 500 tons of finished natural sand an hour and, at peak production, to process about 190,000 tons of sand per month. The sand could be shipped out by railroad in either 3,500 ton lots or 7,000 ton lots. In the second month of production the plant produced 100,000 tons of sand and loaded 320 railroad cars of 77½ ton capacity. It is clear from this recitation that Hollander intended a business of large quantity sand sales for commercial and construction use.

■ In this business context, the size of the sale to Martin Marietta could not be described in the terms often applied to bulk transfers, namely as a "rare, irregular event, occurring but few times in the life of a merchant." *Sternberg v. Rubenstein*, 305 N.Y. 235, 112 N.E.2d 210 (1953). Clearly, Martin Marietta's purpose in contracting to buy 50,000 tons of sand per month for three

months to keep Hollander afloat pending a decision whether to acquire the plant was rare. Buyers interested in purchasing the whole business do not appear every day. But Martin Marietta's method of "testing the waters" was to make ordinary purchases. Thus while the underlying purpose was unusual, the sale of the sand itself was not. Indeed, Martin Marietta's very purpose makes the sale a far cry from the danger that the bulk transfer act is intended to prevent. The primary danger of a bulk transfer is that the transferor will more easily go out of business leaving the creditors remediless.

Although Martin Marietta may have been contemplating a bulk transfer in the future as part of acquiring the business, I find that it was not then participating in a bulk transfer when it made its sand purchases. Moreover, Martin Marietta abandoned its acquisition plan in November, as stipulated by the parties, and continued performance of the contract as an ordinary sand purchase and not as an enterprise acquisition. Although it was a large contract for the normally slow winter season, the selling price was market price, not cut-rate. For a business that was geared up to sell in large quantities, it simply amounted to a good deal and not a bulk transfer. That conclusion is strengthened when the second bulk transfer element, "transfer of a major part of the inventory," is considered.

■ The New Jersey Study Comment to N.J.S.A. 12A:6–102 suggests that "major part" means more than 50% of the inventory. The plaintiff argues that the 50 million tons of sand in the ground should be considered Hollander's inventory and the sale to Martin Marietta should be measured against that quantity. In my judgment, however, only extracted sand can be considered inventory [3] and the Martin Marietta

---

3. The plaintiff bases its argument on N.J.S.A. 12A:9–109 which breaks goods into four mutually exclusive classifications: consumer goods, equipment, farm products and inventory. The Bulk Transfer Act does have a cross-reference to this section. N.J.S.A. 12A:6–102(1). However, N.J.S.A. 12A:9–109 classifications apply to "goods" and there is some question whether sand in the ground is "goods" or realty. N.J.S.A. 12A:9–105(1)(f) defines "goods" as "all things which are movable at the time the security interest attaches or which are fixtures (12A:9–313), but does not include money, documents, instruments, accounts, chattel paper,

sale should be compared against that inventory. But there is still the problem of determining just when the transfer occurred.

The defendant argues that the transfer took place when Martin Marietta placed signs around the sand pile in January 1974. As of December 31, 1973, Hollander had approximately 69,000 tons of sand stockpiled, approximately the same amount "transferred" by identification on January 14, 1974. The defendant argues that therefore a "major part" of Hollander inventory was transferred. The record, however, is ambiguous and does not provide facts on which to pinpoint when identification, and thus when transfer, occurred. The Third Circuit held that if the sand had been extracted and existed at the time of making the contract, identification to the contract occurred at that time. *Martin Marietta, supra* at 749. But if the sand did not exist at the time of contracting, the court held that identification occurred when Martin Marietta posted the signs. *Id.* at 750.

It makes more sense, in any event, to measure the size of the sale to Martin Marietta against Hollander's inventory for the six month period ending December 31, 1973. This is because, given the nature of the business involving large scale production and sales coupled with seasonal fluctuations, a six month measuring period gives a more accurate result. In addition, the sale of sand under the contract was accomplished in several transfers over several months. The record shows an inventory of about 500,000 tons for the period July 1, 1973 to December 31, 1973. Out of that inventory, Martin Marietta purchased 150,000 tons, not even one third of the total. It is clear, therefore, that no matter what date the "identification" of the sand to the contract occurred the Martin Marietta purchase did not constitute a transfer of a "major part" of the inventory under N.J.S.A. 12A:6–102(1).

Moreover, the circumstances of this transfer did not reflect either of the major bulk transfer risks. The U.C.C. comment to § 6–101 describes these risks:

(a) The merchant, owing debts, who sells out his stock in trade to a friend for less than it is worth, pays his creditors less than he owes them, and hopes to come back into the business through the back door some time in the future.

(b) The merchant, owing debts, who sells out his stock in trade to any one for any price, pockets the proceeds, and disappears leaving his creditors unpaid.

One commentator, in discussing the risk, stated:

Since the purpose of the Code is to prevent the improper application of the purchase money by a seller going out of business, if a sale does not result in a practical termination or curtailment of the normal business of the seller it would not constitute a bulk transfer within the meaning of the Code.

Raff, *supra* at 108.

In this case, Martin Marietta's purchase undoubtedly contributed to Hollander's business health. Hollander continued in business nearly a year after the transaction. It is apparent that none of the evils to be warded off by article 6 were present in this transaction. Moreover, even though sand in the ground is not considered "goods" until it is excavated, *see* N.J.S.A. 12A:9–105(1)(f), and therefore cannot constitute "inventory" under N.J.S.A. 12A:9–109(4), realistically the risks addressed by the bulk transfer act are not present where the sell-

general intangibles, contract rights and other things in action. 'Goods' also include the unborn young of animals and growing crops." Sand is not very movable even when extracted, but it is not movable at all when it is in the ground. Thus it would appear that the unextracted sand is not "goods" and therefore not "inventory". This conclusion is buttressed by language in the security agreement between Hollander and the Bank which states: "As to

Collateral which is inventory, sand, gravel or other minerals heretofore or hereafter extracted from the Sand Plant, [Hollander] may, until notice from the Bank, sell, lease or otherwise dispose of it." Since the unextracted sand satisfies neither the article 9 nor the actual security interest definition of inventory, the size of the Martin Marietta transfer should not be measured against that quantity.

er has ready access to and control of the source of the inventory, in this case 50 million tons of sand in the ground. The record demonstrates that sand was frequently loaded for shipment directly from the dredger rather than from stockpiles. Thus, even if a transfer of Hollander's entire stockpile of sand were found to have occurred in January 1974, nothing in such a transfer would have affected Hollander's ability to continue processing and marketing the 50 million tons in the ground.

■ Based on the foregoing analysis, I have determined that the Martin Marietta purchase did not satisfy the statutory definition of a bulk transfer under N.J.S.A. 12A:6–102(1). Accordingly, I have concluded that the Martin Marietta purchase was in the ordinary course of business. This conclusion requires me to find that the sale was not in violation of the security agreement between Hollander and New Jersey National Bank. *See Martin Marietta, supra* at 752. The relevant term in the security agreement reads:

> As to Collateral which is inventory, sand, gravel or other minerals heretofore or hereafter extracted from the Sand Plant, [Hollander] may, until notice from the Bank, sell, lease or otherwise dispose of it in the *ordinary course of business* and collect the cash or non-cash proceeds thereof. (Emphasis added).

The Third Circuit stated that good faith in this case depended on whether Martin Marietta knew that the sale of the sand violated the security agreement. Since I have just found that the sale did not violate the security agreement because it was in the ordinary course of business, I must conclude that Martin Marietta had the requisite good faith. It is clear then, that the two elements, good faith and buying in the ordinary course have been satisfied and that Martin Marietta was a buyer in the ordinary course of business. Therefore, under N.J.S.A. 12A:9–304 Martin Marietta, as a buyer in the ordinary course, has a right to the sand free from any competing security interest. The Bank's only interest, then, was in the proceeds of the sand. *See* N.J.

S.A. 12A:9–306 and comment 3. The Bank, however, wishes to raise new defenses on this remand. I will deal with the question of their right to raise new issues next.

### III  SCOPE ON REMAND

■ The defendant wishes to assert additional defenses under N.J.S.A. 12A:2–402(2) (fraudulent retention) and N.J.S.A. 12A:2–712 (cover). I have the discretion to allow this provided it does not run counter to the mandate of the appellate court. *See R. E. B. v. Ralston Purina Co.*, 525 F.2d 749 (1975); Moore's Federal Practice ¶ 15.11. In my judgment, the Third Circuit's invitation on remand to consider "any other theory that may be applicable" allows me the requisite discretion. *Martin Marietta, supra* at 754. Two factors to consider in assessing whether to allow the defenses are delay and prejudice to one's adversary. *R. E. B., supra* at 751. The assertion of these defenses will cause no delay because no additional testimony or evidence will be required. Moreover, the plaintiff will not be prejudiced because the defendant notified the plaintiff of the intended fraudulent retention defense while there was opportunity to take additional testimony. The plaintiff also had notice of the cover issue because the defendant attempted to amend the pretrial order at trial. I, therefore, will consider these defenses. Since the "cover" argument under N.J.S.A. 12A:2–712 is more properly a damages issue, rather than a defense, I will consider it in the damages section of this opinion.

### IV  FRAUDULENT RETENTION UNDER N.J.S.A. 12A:2–402(2)

■ Section 2–402(2) defines the rights of a seller's unsecured creditor against sold goods. Since I have held that Martin Marietta's right to the sand was free of the defendant's security interest under N.J.S.A. 12A:9–307(1), the Bank would be an unsecured creditor *vis a vis* the sand. N.J.S.A. 12A:2–402(2) provides:

> (2) A creditor of the seller may treat a sale or an identification of goods to a contract for sale as void if as against him

a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are situated, except that retention of possession in good faith and current course of trade by a merchant-seller for a commercially reasonable time after a sale or identification is not fraudulent.

In New Jersey, retention of goods by the seller is only presumptively fraudulent, and can be rebutted by evidence. According to the New Jersey Supreme Court in *Wooley v. Crescent Automobile Co.*, 83 N.J.L. 244 (Sup.Ct.1912)

> The question in every case is whether the act done is a *bona fide* transaction, or a trick and a contrivance to defeat creditors. The possession by the vendor of personal chattels after the sale is not conclusive evidence of fraud. * * * In all cases, whether fraudulent or not, it is a question of intent to be settled as a question of fact. . . .

*Id.* at 246. It is clear from the record that the sale of sand and subsequent stockpiling was not motivated by fraudulent intent on the part of either Hollander or Martin Marietta. The purchase price of $1.10 a ton was fair. Even the defendant's expert admitted that fact.

Although the original motive for purchasing the sand for three months was to keep Hollander viable while Martin Marietta investigated the feasibility of acquiring Hollander, such a motive was not fraudulent to Hollander's creditors in general, nor to the Bank in particular. Indeed, the Bank was informed of the potential sale of the sand plant during the negotiations. I find that the decision to stockpile the sand was a matter of expediency. Sand is an expensive commodity to move. One of Hollander's employees testified that even moving it around the sand plant is expensive and kept to a minimum. During the Winter of 1973–74, potential rail transportation was preempted by coal shipments to meet the exigencies created by the oil embargo. Moreover, the market for sand in the Winter always shrinks. The financial report for the 6 months ending December 1973, which

the Bank received, noted the existence of a customer's prepaid stockpile. In January 1974, Martin Marietta posted signs around the stockpile. Throughout 1974, Martin Marietta made efforts to sell the sand, finally entering a contract in December 1974. All of Martin Marietta's actions support a finding of a bona fide transaction and rebut the presumption of fraud. That being so, there is no need to discuss the exception for goods held in good faith and current course of trade.

The "goods held in good faith and current course of trade" exception was designed for states where retention of goods by the seller after a sale is deemed to be *per se* fraudulent and has no effect on New Jersey's presumptively fraudulent treatment. *See* N.J.S.A. 12A:2–402 New Jersey Study Comment 2. It is my conclusion, based on the evidence summarized above, that the sale of sand to Martin Marietta and subsequent stockpiling at the Woodmansie plant was a bona fide transaction undertaken without any intent to defraud or trick Hollander's creditors. Accordingly, New Jersey National Bank is not entitled to treat the transaction as void under N.J.S.A. 12A:2–402(2) and the sand that was stockpiled at Hollander's Woodmansie sand plant belonged to Martin Marietta.

## V DAMAGES

■ Although I have concluded in preceding sections that the sand in question belonged to Martin Marietta, the sand is no longer at the site. The record shows that on December 6, 1974, Hollander ceased its sand processing operations. On December 7, 1974, Woodland, Inc. took control of the plant as the Bank's agent with authority to sell the sand located there. Between January 14 and April 30, 1975, Woodland, Inc. sold 55,268.66 tons of sand located at Woodmansie. Since this sand was legally the property of Martin Marietta, the defendant Bank is liable for conversion. The only question remaining is the quantum of damages.

■ Under New Jersey law it has long been settled that the victim of conver-

sion is entitled to recover the market value of the chattel at the time of loss as well as any consequential damages. *Guido v. Hudson Transit Lines*, 178 F.2d 740 (3d Cir. 1950); *Winkler v. Hartford Accident and Indemnity Co.*, 66 N.J.Super. 22, 28, 168 A.2d 418 (App.Div.1961). The record shows that on October 22, 1974 the Martin Marietta stockpile was measured and determined to be 61,890 tons and that the stockpile remained untouched until December 7, 1974. Martin Marietta is at least entitled to the loss of this pile valued at $1.10 a ton, the market price that Martin Marietta paid. The Bank argues that it should only be liable for the 22,447.50 tons of concrete sand that it sold between January 13 and April 30, 1975. The record does not show whether this was all the concrete sand on the premises. Since the Bank was in control of the sand plant from December 7, 1974 on and the sand purchased by Martin Marietta was located there, I find the Bank liable for conversion of the entire 61,890 tons of construction sand that the record shows existed in October and remained untouched until the Bank's agent took over on December 7, 1974.[4]

In addition to the value of the lost sand, Martin Marietta is seeking $.40 a ton in lost profits as consequential damages. On December 13, 1974 Martin Marietta entered into a sales contract with Rockland Ready Mix Inc. whereby Rockland would purchase the 62,443 tons of sand which Martin Marietta had stored at Woodmansie.[5] If that contract had been performed Martin Marietta would have netted $.40 above what it had paid for the sand. The defendant asserts that the lost profit on the contract could have been avoided if the plaintiff had covered under N.J.S.A. 12A:2–712. That section provides:

(1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (12A:2–715), but less expenses saved in consequence of the seller's breach.

(3) Failure of the buyer to effect cover within this section does not bar him from any other remedy. L.1961, c. 120, § 2–712.

I have rejected the Bank's argument for two reasons. First, "cover" is a permissive remedy for an aggrieved buyer, not a mandatory remedy. The statute explicitly states that "Failure of the buyer to effect cover within this section does not bar him from any other remedy." N.J.S.A. 12A:2–712(3). Second, "cover" is a remedy for breach of contract. The plaintiff is suing for conversion, a tort. The plaintiff has no breach of contract claim against the defendant who is not a breaching seller, but a converter. Indeed, Martin Marietta has never asserted that it had any sort of contract at all with the Bank. Therefore, the defendant's argument based on cover simply is not applicable.

Similarly, the defendant's arguments against allowing prejudgment interest are all based on contract cases. This is a tort case. Under New Jersey Court R.4:42–11(b) a tort plaintiff is entitled to 8% interest from April 8, 1975, the date of filing the complaint. A federal court may award prejudgment interest if it is provided for under applicable state law. Wright & Miller, *Federal Practice and Procedure*, § 2664, at 114.

To sum up, for the reasons expressed herein, I have found that the New Jersey National Bank is liable to Martin Marietta for conversion of 61,890 tons of construction sand valued at $1.10 per ton, the price the plaintiff originally paid for it. As part of

---

**4.** Although Martin Marietta paid for 62,443 tons of sand stockpiled at Woodmansie, the last measurement on the record only establishes 61,890 tons in the stockpile before the Bank took over, hence the Bank should only be liable for that amount.

**5.** See note 4 *supra*.

the consequential damages resulting from the conversion, the Bank is liable for the lost profit on that 61,890 tons of sand, namely $.40 a ton. Lastly the Bank is liable for 8% prejudgment interest from April 18, 1975, the date the complaint was filed.

A judgment in accordance with this opinion was filed on November 10, 1980.