653 F.2d 779
 31 UCC Rep.Serv. 1065
 MARTIN MARIETTA CORPORATION, a Corporation of the State of
Maryland, Appellee,
v.
NEW JERSEY NATIONAL BANK, a National Banking Association,
Defendant and Plaintiff-on-Counterclaim,
v.
TAMBURELLI PROPERTIES, INC., Additional Defendant-on-Counterclaim,
New Jersey National Bank, Appellant.
 No. 80-2853.
 United States Court of Appeals,
Third Circuit.
 Argued May 21, 1981.
Submitted June 15, 1981.
Decided June 30, 1981.
 
 Carpenter, Bennett & Morrissey, Newark, N. J., for appellee; Jerome J. Graham, Jr. (argued), Laurence Reich, Newark, N. J., of counsel; William A. Carpenter, Jr., Newark, N. J., on brief.
 Stark & Stark, Lawrenceville, N. J., for appellant; Richard N. Shaine, Lewis J. Pepperman, Lawrenceville, N. J. (argued), on brief.
 Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 ADAMS, Circuit Judge.
 
 
 1
 a.
 
 
 2
 This diversity case, in which the parties agree that the law of New Jersey governs, involves a dispute over 62,443 tons of sand. The plaintiff, Martin Marietta Corporation, purchased approximately 136,657 tons of sand during the last three months of 1973 from Hollander Sand Associates ("Hollander"), taking delivery on 59,189 tons and stockpiling the rest at Hollander's facilities in Woodmansie, New Jersey. The stockpiled sand, as inventory of Hollander, was subject to a security interest held by the defendant New Jersey National Bank ("Bank"). Throughout the fall of 1974, Hollander had trouble meeting its loan payments to the Bank and finally defaulted. On December 7, 1974, the Bank took control of the sandplant and authorized its agent to sell the sand located there. Martin Marietta, claiming that the Bank sold its sand, brought suit for conversion.
 
 
 3
 After a bench trial, the late Judge Barlow found for the Bank on two grounds. First, it held that the sand claimed by Martin Marietta had not been identified to the contract, a necessary prerequisite under the Uniform Commercial Code to asserting claims against third parties, in this case the Bank, when the goods in question have remained in the possession of the seller. N.J.S.A. 12A: 2-722. Second, Judge Barlow held that Martin Marietta did not meet the good faith requirement of a "buyer in the ordinary course of business," and therefore could not take priority over the Bank's perfected security interest as provided in N.J.S.A. 12A:9-307.
 
 
 4
 We reversed on both grounds. First, we held that the sand had been identified to the contract between Martin Marietta and Hollander, although the record was unclear as to when exactly this identification occurred. Martin Marietta Corp. v. N. J. National Bank, 612 F.2d 745, 749-51 (3d Cir. 1979). Thus, we declared, Martin Marietta was entitled to assert a claim against the Bank, a third party, even though Martin Marietta had left the sand in question in the possession of the seller, Hollander.
 
 
 5
 Second, we held that the district court erred in ruling that Martin Marietta failed to satisfy the good faith standard. Under N.J.S.A. 12A:9-307, a "buyer in the ordinary course of business" takes free of a perfected security interest. A "buyer in the ordinary course of business" is defined in N.J.S.A. 12A:1-201(9) as:.... a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind but does not include a pawnbroker.
 
 
 6
 On the prior appeal, we considered two elements, "good faith" and "buying in the ordinary course," to be critical in determining whether Martin Marietta satisfied the definition set forth in 1-201(9). Adopting a subjective standard, we stated that, in this case, the question of good faith turned on whether the plaintiff knew that the sale of sand was not in the ordinary course. Martin Marietta, 612 F.2d at 753. But this question, in turn, depended on whether in fact the sale was not in the ordinary course. We, however, declined to establish a test for determining "buying in the ordinary course." Stating that the article on bulk transfers, N.J.S.A. 12A:6-101 et seq., provided a possible framework for analysis of this question, we remanded the case for consideration on that theory and any other theory that may be applicable. Martin Marietta, 612 F.2d at 754.
 
 
 7
 When the case returned to the district court, the parties agreed to a trial on the record as established. Judge Ackerman, who replaced Judge Barlow, concluded in a comprehensive opinion that the transaction between Martin Marietta and Hollander did not constitute a bulk transfer because the sale was in the ordinary course of the business of Hollander. Martin Marietta's rights in the sand therefore took precedence over the Bank's security interest. The district court, 505 F.Supp. 946, also considered the Bank's defenses under N.J.S.A. 12A:2-712, concluding that the facts did not support the defenses raised. Accordingly, the district court held the Bank liable to Martin Marietta for conversion of the sand. The Court entered judgment in the amount of $92,835.00 in favor of Martin Marietta against the Bank, plus $40,847.40 in pre-judgment interest.
 
 
 8
 The present appeal confronts us with the following issues: (1) whether the district court erred in concluding that the transaction between Martin Marietta and Hollander was not a bulk transfer; (2) whether Hollander's continued possession of the sand that it had sold to Martin Marietta was fraudulent; (3) whether damages should have been awarded based on 61,890 tons or a lesser amount of sand; (4) whether plaintiff had a duty to "cover"; and (5) whether the district court properly awarded prejudgment interest.
 
 
 9
 We affirm the judgment in all respects except as to plaintiff's duty to cover; on this point, we remand.
 
 
 10
 b.
 
 
 11
 A "bulk transfer" is defined in N.J.S.A. 12A:6-102(1) as:
 
 
 12
 ... any transfer in bulk and not in the ordinary course of the transferor's business of a major part of the materials, supplies, merchandise or other inventory of an enterprise subject to this Article.
 
 
 13
 A bulk sale of inventory of a debtor triggers certain rights in a creditor, such as notice from the buyer and an opportunity for the creditor to step in to protect its interest. N.J.S.A. 12A:6-104, -105. If these requirements are not complied with, the bulk transfer is ineffective against a creditor of the seller. Id. In the present case, it is undisputed that the preconditions of N.J.S.A. 12A:6-104, -105 were not satisfied.
 
 
 14
 Accordingly, the principal issue before the district court was whether the sale by Hollander to Martin Marietta was a bulk transfer for purposes of Article 6. The district court's opinion on this question is thorough and persuasive, and no authority cited by the Bank rebuts the conclusion that the transfer was not a bulk sale.
 
 
 15
 Briefly summarized, the reasons for so holding are as follows: Hollander's plant occupied 1,500 acres and had a potential yield of 50 million tons of natural sand. The plant had the capacity to process 190,000 tons of sand per month, and in one month preceding the sale produced 100,000 tons of sand; in the first six months of operation Hollander sold 500,000 tons of sand. In this context, a sale of 50,000 tons per month for three months is not such an extraordinary event that it should trigger the protections of Article 6. The New Jersey Study Comment to N.J.S.A. 12A: 6-102 supports this view. It suggests that a bulk sale does not occur if less than 50% of inventory has been transferred. If the inventory of the Hollander plant is understood as its potential yield of 50,000,000 tons, the transfer to Martin Marietta involved far less than 50% of its inventory. If only extracted sand can be considered inventory, then the sale to Martin Marietta must be measured against that inventory. But on this standard too, the sale amounted to less than a 50% transfer.
 
 
 16
 The Bank argues that the transfer took place when Martin Marietta placed signs around the sand pile on January 14, 1974. As of December 31, 1973, Hollander had 69,000 tons of sand stockpiled, approximately the same amount "transferred" by identification on January 14, 1974. The Bank maintains that therefore a "major part" of Hollander's inventory was transferred. The record, however, is ambiguous on this point, and does not provide facts on which to pinpoint when identification, and thus when transfer, occurred. On the prior appeal, we held that if the sand had been extracted and existed at the time of making the contract, identification to the contract occurred at that time. Martin Marietta, 612 F.2d at 749. If the sand did not exist at the time of contracting, we held that identification occurred when Martin Marietta posted the signs. Id. at 750.
 
 
 17
 It would seem reasonable, in any event, to measure the size of the sale to Martin Marietta against Hollander's inventory for the six month period ending December 31, 1973. Given that the business involved large scale production and sales coupled with seasonal fluctuations, a six month measuring period provides a more accurate result. In addition, the sale of sand under the contract was accomplished by several transfers over several months. The record shows an inventory of about 500,000 tons for the period July 1, 1973 to December 31, 1973. Out of that inventory, Martin Marietta purchased 150,000 tons, not even one third of the total. It is clear, therefore, that no matter what date the "identification" of the sand to the contract occurred, the purchase by Martin Marietta did not constitute a transfer of a "major part" of the inventory under N.J.S.A. 12A: 6-102(1).
 
 
 18
 We also note that the controverted transaction did not violate the policies underlying Article 6. The comment to N.J.S.A. 12A: 6-101 describes the risks that attend major bulk transfers:
 
 
 19
 (a) The merchant, owing debts, who sells out his stock in trade to a friend for less than it is worth, pays his creditors less than he owes them, and hopes to come back into the business through the back door some time in the future.
 
 
 20
 (b) The merchant, owing debts, who sells out his stock in trade to any one for any price, pockets the proceeds, and disappears leaving his creditors unpaid.
 
 
 21
 See also Raff, Bulk Transfers Under the Uniform Commercial Code, 17 Rutgers L.Rev. 107, 108 (1962) (no bulk sale if sale "does not result in a practical termination or curtailment of the normal business of the seller").
 
 
 22
 The Bank does not allege that Hollander's sale to Martin Marietta exhibited either of the risks referred to in the Comment. The purpose behind the sale was to help keep Hollander afloat pending Martin Marietta's decision whether to buy the plant. Hollander, moreover, continued in business nearly a year after the transaction. The purpose and effect of the sale to Martin Marietta belie any suggestion that the goal of either party was to enable Hollander to go out of business and leave its creditor remediless. The policies underlying Article 6 thus are not implicated in this case.
 
 
 23
 For the foregoing reasons, we conclude that the district court did not err in determining that the sale between Hollander and Martin Marietta was not a bulk transfer.
 
 
 24
 c.
 
 
 25
 With respect to the claim of fraudulent retention, N.J.S.A. 12A: 2-402(2) provides:A creditor of the seller may treat a sale or an identification of goods to a contract for sale as void if as against him a retention of possession by the seller is fraudulent under any rule of law of the state where the goods are situated, except that retention of possession in good faith and current course of trade by a merchant seller for a commercially reasonable time after a sale or identification is not fraudulent.
 
 
 26
 The New Jersey Study Comment to the section asserts that the provision codified, and incorporated by reference, prior New Jersey law:
 
 
 27
 Subsection 2-402(2) restates the rule of N.J.S.A. 46:30-32 (U.S.A. sec. 26) but provides an exception in the case of goods held in good faith and current course of trade. The exception is aimed at giving some leeway in retention situations occurring in States in which retention of the goods by the seller after a sale is per se deemed to be fraudulent. In New Jersey, a seller's retention of possession after a sale is only presumptively fraudulent. Wooley v. Crescent Automobile Co., 83 N.J.L. 244, 83 A. 876 (1912); see, Runyon v. Groshon, 12 N.J.Eq. 86 (1858) (mortgage). Consequently, the additional language of subsection 2-402(2) makes no modification in the law of New Jersey.
 
 
 28
 Subsection 2-204(2) would incorporate by reference the present New Jersey law that a retention of possession by the seller after the consummation of a sale is only presumptively fraudulent.
 
 
 29
 In Wooley v. Crescent Automobile Co., 83 N.J.L. 244, 83 A. 876 (Sup.Ct.1912), referred to in the Study Comment, the seller sold an automobile to the plaintiff in partial satisfaction of a debt. The plaintiff, however, arranged for the seller to retain possession of the car for the duration of plaintiff's imminent business trip. While the car was in the seller's possession, another of the seller's creditors attempted to replevin the automobile. Holding that plaintiff's title to the car was not rendered void because he allowed the car to remain in the possession of the seller, the court said:
 
 
 30
 The question in every case is whether the act done is a bona fide transaction, or a trick and a contrivance to defeat creditors. The possession by the vendor of personal chattels after the sale is not conclusive evidence of a fraud.... In all cases, whether fraudulent or not, it is a question of intent to be settled as a question of fact by a jury.
 
 
 31
 83 N.J.L. at 246, 83 A. at 877.
 
 
 32
 In the present situation, ample evidence supports the district court's conclusion that Hollander's continued possession of the sand was not a "trick and a contrivance." The Bank was informed of the potential sale of the sand during the negotiations between Hollander and Martin Marietta. Martin Marietta's stockpiling of sand at the Hollander facility was specifically mentioned in the Hollander balance sheet of December 31, 1973, a copy of which was received by the Bank. Footnote 7 of the balance sheet stated: "The partnership has received $83,316.75 in payments from a customer (Martin Marietta) for sand which was not shipped at the end of the year, and $10,000 as an advance from that customer against freight payment." In addition to notification to the Bank, other factors support the conclusion that Hollander's retention of the sand was part of a bona fide transaction not designed to defeat any creditor. Evidence at trial established that sand is expensive and difficult to move; moreover, potential rail transportation was preempted during the winter of 1973-74 by coal shipments needed to meet the exigencies created by the Arab oil embargo. In January 1974, Martin Marietta posted signs around the stockpile, proclaiming "Property of Martin Marietta Aggregate." Later that year, Martin Marietta tried to sell the sand, and entered into a contract in December 1974.
 
 
 33
 The above facts support the district court's conclusion that the transaction between Martin Marietta and Hollander was a bona fide sale undertaken without any intention to defraud or trick the Bank or other creditors. We will not disturb the district judge's conclusion that Martin Marietta has successfully rebutted the N.J.S.A. 12A: 2-402(a) presumption of fraud, and that the transaction was not void as against the Bank.
 
 
 34
 On October 22, 1974, representatives of Martin Marietta surveyed the stockpiled sand, concluding that 61,890 tons were stored at the Hollander plant. On December 7, 1974, the Bank, through its agent Woodland, Inc., took control of the plant. Between January 14, and April 30, 1975, Woodlawn sold 55,286.66 tons of sand from the plant. Since, as discussed above, the sand was legally the property of Martin Marietta, we cannot say that the district court erred in holding the Bank liable for conversion.
 
 
 35
 d.
 
 
 36
 The remaining issues in the case relate to the proper measure of damages. The judge found the Bank liable for the purchase price and lost profits ($1.50/ton) of 61,890 tons of sand the amount known to be stored at the plant on October 22, 1974. The Bank challenges this quantification of damages on two grounds. First, while conceding that the stockpile measured 61,890 tons on October 22, it contends that sand was constantly being added to and subtracted from the pile between that date and the Bank's assumption of control on December 7, 1974. Although the evidence on this point was conflicting, the district court found as a fact that the stockpile remained untouched between October 22 and December 7. This finding is not clearly erroneous.
 
 
 37
 Next, the Bank urges that the stockpile contained not merely concrete sand the particular variety of sand that Martin Marietta had contracted for but other types of construction sand as well. The Bank contends that damages be measured on the basis of 22,447 tons, the amount of concrete sand that it sold after taking control, since this is the largest amount that can be said with certainty to have existed at the Hollander plant on the day of the unlawful conversion. Again, the record contains conflicting evidence on this point. Some testimony, including that offered by Martin Marietta's sales representatives, suggests that the pile, while containing mainly concrete sand, may have contained a lesser grade of silt sand as well. On the other hand, both Hollander and Martin Marietta treated the stockpile as belonging in its entirety to Martin Marietta, thereby suggesting that its contents were of a grade sufficiently high to satisfy the contract. Thus an internal Martin Marietta memorandum, filed after its survey of the plant and its testing of the sand, asserts that the "MMA (Martin Marietta) tonnage in the stockpile was determined to be 61,890 tons." When the stockpile was slightly larger, and Hollander negotiated to buy back some of the sand, its communications to Martin Marietta state that "we (are) holding 66,443 tons of sand for your account for which you had previously paid," app. at 450; this would constitute the entire pile. We will not disturb the district court's determination of this factual dispute in favor of Martin Marietta.
 
 
 38
 e.
 
 
 39
 Another of the Bank's objections to the measure of damages is more troubling. The district court awarded Martin Marietta damages of $1.50 per ton $1.10 for the purchase price of undelivered sand and $0.40 in lost profits. The Bank urges that Martin Marietta not be permitted to recover damages based on lost profits, since Martin Marietta failed to "cover." In so arguing, the Bank cites N.J.S.A. 12A: 2-715(2), which limits consequential damages to those "which could not reasonably be prevented by cover or otherwise." Martin Marietta points out, however, that § 2-715 deals with a buyer's remedy against a seller. Here there is no breach of contract claim against the Bank or against Hollander. Instead, Martin Marietta has brought an action sounding in tort for unlawful conversion. The provisions of Article 2 of New Jersey's Uniform Commercial Code do not apply to this lawsuit.
 
 
 40
 Nonetheless, the district court's rejection of the Bank's argument about "cover" on the ground that this is a tort rather than a contract action is not completely satisfactory. As a matter of common law, New Jersey places on tort victims a duty to mitigate damages by covering. See Harvard v. Bushberg Bros., 137 N.J.Super. 537, 542, 350 A.2d 65, 68 (App.Div.1975) ("Traditional concepts of ... tort law require one wronged by the action of another to mitigate damages") (limiting recovery of plaintiff who resigned job when wrongfully not promoted to difference between salary she would have made if continued in job and salary she would have made if promoted); Henry Clay v. Jersey City, 74 N.J.Super. 490, 498-99, 181 A.2d 545, 550 (Ch.Div.1962) ("The law requires that a party who has been injured by a tort must make a reasonable effort to mitigate his damages."); McGraw v. Johnson, 42 N.J.Super. 267, 274, 126 A.2d 203, 207 (App.Div.1956) ("the requirement that plaintiffs mitigate damages prevails as much in the case of damages arising out of tort as it does in the case of breach of contract") (tortious interference with contract).
 
 
 41
 The Restatement (Second) of Torts provides that, in the case of tortious conversion, an injured party that "could readily have secured adequate substitutes" is not entitled to recover for the loss of a profitable contract. See § 918 & Comment g. The Restatement also indicates that the tortfeasor bears the burden of showing that the victim failed to take reasonable efforts to avoid the loss. Id. The Bank's only evidence on this issue was testimony that in April of 1975 Martin Marietta probably could have obtained 62,000 tons of replacement sand from another supplier. The district court, however, would not allow testimony regarding the cost of replacement sand. Thus there is nothing in the record to indicate whether Martin Marietta could have obtained replacement sand at less than the $1.50 for which the court found it could have sold the sand. Because the district court, at the first hearing, foreclosed the Bank from offering evidence on this point, a limited remand is in order to determine whether Martin Marietta reasonably discharged its duty to mitigate damages.
 
 
 42
 f.
 
 
 43
 The Bank also contested the propriety, under New Jersey law, of the district court's award to Martin Marietta of prejudgment interest.[1] Such interest is authorized in tort cases by New Jersey Court Rule 4:42-11(b), and the Bank has demonstrated no exceptional circumstances that would justify departure from the general rule.
 
 Conclusion
 
 44
 The judgment of the district court will be affirmed in all respects except as to the computation of damages; the cause will be remanded to determine whether Martin Marietta fulfilled its obligation to mitigate damages.
 
 
 
 [1]
 The district court evidently believed that the New Jersey rule concerning pre-judgment interest binds a federal court sitting in diversity jurisdiction. The applicability of a particular provision of state law depends, as we have noted before, "not on the distinction between substance and procedure, but on the policies underlying the Erie (R.R. v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)) doctrine." Stoner v. Presbyterian Univ. Hosp., 609 F.2d 109, 111 (3d Cir. 1979); accord, Witherow v. Firestone Tire & Rubber Co., 530 F.2d 160, 163-66 (3d Cir. 1976). Inasmuch as the Bank does not contest the court's determination that the New Jersey rule states the governing law, we express no view on this question. See Huddell v. Levin, 537 F.2d 726, 742-43 (3d Cir. 1976)